**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**ALFREDO TREVINO and**
**CHARLENE JIMENEZ** **PLAINTIFFS**

**V.** **4:24CV01136 JM**

**THE BOARD OF TRUSTEES OF**
**THE UNIVERSITY OF ARKANSAS** **DEFENDANT**

**ORDER**

Pending is the Defendant's motion for summary judgment. Plaintiffs have responded to the motion and the Defendant has replied. For the reasons stated below, the motion is granted.

I. Facts

Alfred Trevino and Charlene Jimenez were students in the University of Arkansas for Medical Sciences ("UAMS") College of Nursing's Doctor of Nursing Practice ("DNP") Nurse Anesthesia Program (the "Program") from August 2020 until January 3, 2023. During the fall semester of their third year, Trevino and Jimenez were accused of Honor Code violations for cheating on assessments and plagiarism. (Third Am. Comp. ¶ 11, Dkt. No. 17). The Honor Code allegations were heard on October 10, 2022, by the College of Nursing ("CON") Honor Council, a student-led body responsible for reviewing alleged Honor Code violations. (Whited Decl., Dkt. No. 36-3 at ¶¶ 4-5). The Honor Council found Trevino and Jimenez guilty of academic misconduct for cheating on assessments. *Id.* at ¶ 6.The Honor Council recommended that Plaintiffs' assessment scores from August 22-28, 2022, be deemed null and void and repeated, that all future assessments be proctored, and that they be placed on academic probation for the remainder of the Program. *Id.* Dr. Patricia Cowan, Dean of the UAMS College of Nursing,

accepted the Honor Council's findings and recommendations and placed Plaintiffs on probation. (Cowan Decl., Dkt. No. 36-4 at ¶ 5).

In late Fall 2022, Jimenez was required to retake the Self-Evaluation Examination ("SEE") administered by the National Board of Certification and Recertification for Nurse Anesthetists, the national certification board for CRNAs. (Gonzalez Decl., Dkt. No. 36-1 at ¶¶ 8-9). The SEE allows nurse anesthesia students nationwide to assess their progress and prepare for the National Certification Exam after graduation. *Id.* at ¶ 8. The UAMS Program requires students to take the SEE during the fall semester of their final year and by the eighth week of the semester. *Id.* at ¶ 9. Students must earn a minimum score of 410 to continue in the Program. *Id.* A student who does not meet that score has one opportunity to retake the exam by the twelfth week of the fall semester. *Id.* These deadlines and score requirements are reiterated in all DNP Anesthesia Practicum courses before students become eligible to sit for the exam and are also outlined in the DNP Anesthesia Practicum III Syllabus for Fall 2022, the semester in which the students should take the exam. *Id.* Jimenez completed her retake of the SEE after the twelve-week deadline. *Id.* Under the policy, that failure could have resulted in a 10% grade reduction for each day the exam was late. *Id.* Because Jimenez retook the exam five days after the deadline, she could have received a 50 as her SEE grade. Dr. Gonzalez, Dr. Dunavan and CON leadership discussed the issue and assigned Jimenez an 80, allowing her to earn a passing score for UAMS and continue in the Program. *Id.*

In addition to the timing and minimum score requirements in the Program Handbook and Practicum III syllabus, the Program Handbook also requires students to notify the Program Director and Clinical Coordinator of the scheduled SEE date and time. *Id.* At her deposition, Jimenez could not recall whether she notified Dr. Gonzalez, the Program Director, as required,

but testified that she would have an email if she had done so. (Jimenez Dep., Dkt. No. 36-10, 54:10 -55:7). Jimenez has not produced any email showing that she notified Dr. Gonzalez of the date she was scheduled to retake the SEE.

In early to mid-December 2022, Dr. Dunavan was copied on an email from Misty Moreno, the Clinical Site Coordinator at Arkansas Children's Hospital (ACH), transmitting final ACH clinical rotation evaluations to Trevino and Jimenez. (Dunavan Decl., Dkt. No. 36-2 at ¶ 7). In the ACH evaluations, Moreno expressed concern that, because of absences, Trevino and Jimenez might not have enough clinical pediatric hours from their ACH rotation. *Id.* Dr. Dunavan asked Moreno to email him the dates of their absences. *Id.* Moreno reported that Trevino missed seven days—November 9, 15, 16, 17, 18, 29, and 30—and Jimenez missed six of those same days—November 9, 15, 16, 17, 18, and 30. *Id.* at Att. 2. Moreno also confirmed that neither student was present on November 24 or 25, Thanksgiving Day or the following Friday, because only emergent surgeries were scheduled on those days. *Id.* at Att. 4.

Trevino and Jimenez did not dispute that they were absent from ACH clinical rotations on those dates. (Trevino Dep., Dkt. No. 36-6 at 101:9-102:14, 103:2-104:15; Jimenez Dep., Dkt. No. 36-10 at 62:23-63:24). Based on the absence of  information, Dr. Dunavan reviewed Trevino's and Jimenez's clinical logs in Typhon, the system the Program used to track students' clinical cases and hours for graduation requirements. (Dunavan Decl., Dkt. No. 36-2, ¶ 9). Dr. Dunavan's review showed that Trevino and Jimenez submitted procedure logs for multiple days when they were absent from clinical rotations, including the November absence dates and the two Thanksgiving holiday dates provided by Moreno. *Id.* After reviewing Trevino's and Jimenez's Typhon records, Dr. Dunavan advised Dr. Gonzalez that the students, who were then on academic probation, had falsified critical Program records. *Id.*

On December 16, 2022, Dr. Dunavan emailed Trevino and Jimenez asking them to meet with him and Dr. Gonzalez on December 19. *Id.* at ¶ 10. The students were scheduled to leave for Texas on December 17 but offered to meet on the afternoon of December 16 or return immediately for a December 19 meeting. Dr. Dunavan responded that the meeting could wait until January 3, 2023, and all parties agreed to meet then. *Id.* Within 45 minutes of Dr. Dunavan's email, Trevino and Jimenez began deleting the falsified case and time logs they had entered. *Id.* Dr. Dunavan printed the audit trail logs reflecting those deletions. *Id*. at Att. 6.

Before the January 3, 2023 meetings, Dr. Dunavan prepared Disciplinary Action Reports identifying the dates Trevino and Jimenez claimed to have worked, the confirmation that they had not worked those dates, and the case-log and hour entries they submitted in Typhon for days they were absent. *Id*. at ¶ 11. On January 3, 2023, Dr. Whited, Dr. Gonzalez, and Dr. Dunavan together, met separately with each student. (Gonzalez Decl., Dkt. No. 36-1 at ¶ 12; Dunavan Decl. Dkt. No. 36-2 at ¶ 12, Cowan Decl., Dkt. No. 36-4 at ¶ 9). During the January 3, 2023 meetings, Dr. Dunavan provided each student with the Disciplinary Action Reports and supporting documentation, and each student had an opportunity to respond. (Trevino Dep., Dkt. No. 36-6, 99:23-100:5; Jimenez Dep., Dkt. No. 36-10, 61:17-62:1).

Trevino stated that other Program students also entered information into Typhon for days they did not work. (Gonzalez Decl., Dkt. No. 36-1at ¶ 12; Dunavan Decl., Dkt. No. 36-2 at ¶ 12). Dr. Gonzalez and Dr. Dunavan later conducted random checks of several other Program students to determine whether they had entered Typhon records for days they were absent, but they found no records supporting Trevino's and Jimenez's claim. ( (Gonzalez Decl., Dkt. No. 36-1at ¶ 13; Dunavan Decl., Dkt. No. 36-2 at ¶ 13). Trevino and Jimenez did not identify any students or

produce any documents during the meetings to support their position. (Gonzalez Decl., Dkt. No. 36-1at ¶ 12; Dunavan Decl., Dkt. No. 36-2 at ¶ 12).

Because Trevino and Jimenez falsified records, Associate Dean Dr. Teresa Whited formally notified each student of dismissal by separate letters dated January 3, 2023, which were provided at the end of their meetings and emailed to each student that same day. (Whited Decl., Dkt. No. 36-4 at ¶ 10). Dr. Whited advised that they were dismissed "for having behavior that is not consistent with professional responsibility and accountability including falsification of student clinical logs . . . , failure to achieve a C or better in all course work, violation of the Scholastic Non-Cognitive Performance Standards, and violation of the AANA Code of Ethics." (Whited Decl., Dkt. No. 36-4 at Attachment 3). The letters then identified the relevant provisions of the 2022-2023 UAMS Academic Catalog, CON Handbook, and Program Handbook supporting the dismissals. *Id.*

Citing the 2022-2023 UAMS Academic Catalog, Dr. Whited explained that "[a] student will be dismissed from the College of Nursing" when the student's behavior is "not consistent with professional responsibility and accountability" and for unprofessional conduct likely to "deceive, defraud, or injure clients or the public" through any act, practice, or omission that fails to meet accepted nursing standards and reflects conscious disregard for public or client welfare. *Id.* Dr. Whited further stated that falsifying student clinical logs violated the Scholastic Non-Cognitive Performance Standards, including maturity, communication, responsibility, authority, professional role, judgment, and ethics, as set forth in the CON Handbook, as well as the American Association of Nurse Anesthesiology (AANA) Code of Ethics in the Program Handbook. *Id.*

On January 10, 2023, both students separately appealed their dismissals to Dr. Cowan alleging that other Program students engaged in similar behavior and concluding that their dismissals were discriminatory. (Cowan Decl., Dkt. No. 36-5 at ¶ 7). In their letters of appeal, they acknowledged entering completed work on incorrect dates but asserted that the entries reflected actual pediatric cases performed during prior rotations at other clinical sites. *Id.* at ¶ 9.

Dr. Cowan reviewed each student's academic file, the Disciplinary Action Reports issued by Dr. Dunavan and supporting documentation, and the materials submitted with each appeal. *Id.* at ¶ 8. Dr. Cowan also met separately with Trevino and Jimenez to discuss their appeals. *Id.* Dr. Cowan upheld both dismissals and notified the students by separate letters dated January 26, 2023. *Id.* at ¶ 10. Dr. Cowan's letters stated that she carefully reviewed the academic files, written information submitted by each student, documents, and information discussed during the meetings. *Id*. at Att. 3. Based on that review, Dr. Cowan concluded that Trevino and Jimenez falsified clinical logs by entering Typhon information representing that they had performed procedures at ACH under ACH preceptors on days they were not present at ACH. *Id*. at ¶ 9. Dr. Cowan concluded that the time estimates were not based on actual patient records because neither student had documentation showing that the cases were real cases performed at other clinical sites. *Id*. at ¶¶ 8-9. Both students also acknowledged that they did not ask the Program Director or Assistant Program Director whether entering cases in that manner was appropriate. *Id.* at ¶ 9. Dr. Cowan noted that Typhon records showed both students deleted the questionable logs after Dr. Dunavan contacted them on December 16 to request a meeting, which indicated "an intent to deceive." *Id.* She found the evidence supporting the dismissals "overwhelming." *Id.*

Plaintiffs filed suit against the Board alleging race discrimination in violation of Title VII and in violation of their Equal Protection rights. Plaintiffs also allege their procedural and substantive due process rights were violated by their dismissal from the Program.

II. <u>Standard for Summary Judgment</u>

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial -- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be invoked carefully so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979), *cert. denied*, 444 U.S. 991 (1979). The Eighth Circuit set out the burden of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the moving party for summary judgment is only to demonstrate, *i.e.*, “[to] point out to the District Court,” that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent’s burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted. *Id.* at 1339. (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d

> 268, 273-274 (8th Cir. 1988) (citations omitted) (brackets in original)). Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.

II. Analysis

A. Title VII Discrimination

"Title VI prohibits discrimination on the basis of race in federally funded programs." *Rowles v. Curators of Univ. of Missouri*, 983 F.3d 345, 355 (8th Cir. 2020) (citing 42 U.S.C. § 2000d). It is undisputed that UAMS receives federal funding. To prevail on their Title VII claims Plaintiffs must show that race or color motivated the Board's discriminatory conduct. Because there is no direct evidence of discrimination Plaintiffs may rely upon the burden shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a prima facie case of race or color discrimination, the Plaintiffs must show: (1) they are members of a protected class; (2) they suffered adverse actions at the hands of the Board, through UAMS, in pursuit of their education; (3) they were qualified to continue in pursuit of their education; and (4) they were treated differently from similarly situated students outside their protected class. *Rowles v. Curators of Univ. of Missouri*, 983 F.3d 345, 355 (8th Cir. 2020) (citing *Ajiwoju v. Curators of Univ. of Mo*., 2009 WL 10705058, at *2 (W.D. Mo. Feb. 11, 2009) (citation omitted), aff'd sub nom. *Ajiwoju v. Univ. of Mo.-Kansas City*, 363 F. App'x 420 (8th Cir. 2010) (per curiam). If Plaintiffs establish a prima facie case, the burden shifts to the Board to proffer a legitimate, nondiscriminatory reason for its decision. *McDonnell Douglas Corp*., 411 U.S. at 802. If the Board proffers such a reason, the burden shifts back to the Plaintiffs to show that the proffered reason was mere pretext for discrimination. *Id.* at 804.

There is no dispute that Plaintiffs are Hispanic and they were dismissed from the Program. The Board argues that Plaintiffs cannot prove the third prong of a prima facie case that

they were qualified to continue their education based upon the fact that they were found guilty of Honor Code violations, placed on academic probation, and logged clinical hours and cases on documented days off. Plaintiffs contend that they were qualified to continue in the Program based upon their grades of all A's and B's prior to receiving failing grades for their final exams and that they were offered lucrative CRNA jobs after graduation. There is a question of fact for the jury on this issue.

To prove the fourth prong of their prima facie case, Plaintiffs contend there were many Program students, who were not Hispanic, that made false entries into Typhon which should have been found by Dr. Dunavan at the time of Plaintiff's false entries. Those students were not dismissed from the Program. In support, Plaintiffs have attached redacted Typhon case logs of eight students in Plaintiff's cohort for January through December 2022. (Dkt. No. 50). Plaintiffs identify these records as those of Ethan Lewis (Dkt. No. 50-26), John Trulove (Dkt. No. 50-27), Darinisha Turner (Dkt. No. 50-28), Emilie Shatto (Dkt. No. 50-29), Steffen Lewis (Dkt. No. 50-30), Austin Berry (Dkt. No. 50-31), Tyler Lindsey (Dkt. No. 50-32), and Yolanda Shaw (Dkt. No. 50-33) to support this argument. They argue that overall student confusion about entering cases into Typhon show that similarly situated students were entering false information and were not dismissed from the Program. In support, they include text messages from unidentified phone numbers discussing questions about Typhon entries and joking about the answers. (Dkt. No. 50-15).

The Board responded to these allegations with the declaration of Dr. Dunavan. Dunavan reviewed each named student's Typhon record and determined that none of the entries cited by Plaintiffs were intentionally false. (Dunavan Dec., Doc. No. 46-3 at ¶ 7). Plaintiffs identified 88 case log details that they believed to be false based on the date entered, the number of entries, or

the locations. Of those, Dunavan found that 10 of the 88 entries did not count toward the students' total anesthesia case requirements because they had no associated case information. *Id.* In other words, the student(s) did not ask for credit for those entries. Thirty six of the identified entries were listed on Mondays. *Id.* at ¶ 8. Generally, Mondays were lecture days for the students, which meant they could not work at their clinical sites. However, Monday, August 1, 2022, fell between academic semesters and was not a class date. *Id.* Therefore, students were free to work at the clinical site they had been assigned to during the summer. September 26, October 10, October 24, and October 31 were Mondays when student exams were due at 8:00 a.m. with no lecture that day. *Id.* Students were free to work at clinical sites. *Id.* There were three identified entries where students indicated in the Typhon note that the case was performed on a different day than when entered. *Id.* The remaining identified entries were entered by students on the same day but in multiple locations which were logistically impossible to accomplish. When Dunavan reviewed those case details, he determined that the student either "failed to change the location from what auto-populated in Typhon or mis-entered" the location information. *Id.* at ¶ 9. Based upon the patient's age and/or the anesthesia clinician identified as the preceptor, Dunavan was able to see that the cases were done at the same location on the specified date. *Id.*

Dunavan explained that he did not review those kinds of logs during the fall of 2022. *Id.* at ¶ 5. He looked at the Typhon records daily to make sure that the students were accumulating the types of clinical hours that they needed to graduate from the Program and become certified to practice. *Id.* Dunavan stated that he would not have discovered that Plaintiffs had falsified cases in Typhon if the Clinical Site Coordinator for ACH, Misty Morena, had not notified him that Plaintiffs had missed a significant number of clinical days. *Id.* at ¶ 11.

The Court finds that the cohort students are not similarly situated to Plaintiffs. There is no evidence that any of the other named students were on academic probation. There is no evidence that any other student entered cases into Typhon for days when they did not work at their clinical site, without stating it in the Typhon notes. There is no evidence that a non-Hispanic student received a negative Clinical Evaluation from a Clinical Site Coordinator where excessive absences were noted. *Id.* at Att. 1.

Plaintiffs have failed to provide any inference of race or color discrimination against them except for their own statements. Both Plaintiffs testified that they had "[n]o complaints of discrimination against any faculty member or college of nursing administration at UAMS through the end of summer of the second Program year. (Trevino Dep., Doc. No. 50-16, 54:25-55:15) Trevino testified that he felt the environment at his Baptist Hospital clinical site changed, not at UAMS. *Id.* at 50:16-When asked whether he felt discrimination was the reason that the environment at Baptist Hospital started to change, Trevino stated, "If I think back, that was the only resolution I had at that moment, I mean, trying to break down the idea of why it was -- this happening to me." He testified that discrimination was the only reason he could think of that the CRNAs and MD anesthesiologists at Baptist started treating him differently. (Trevino Dep, p. 62:12-63:4).

The Court finds that Plaintiffs have failed to present evidence of similarly situated non-Hispanic students who were treated differently. Therefore, they are unable to prove a prima facie case of discrimination under Title VII. Even assuming Plaintiffs stated a prima facie case, the Board has stated a legitimate, nondiscriminatory reason for its decision to dismiss Plaintiffs from the Program, falsifying student clinical logs. Plaintiffs have presented no evidence showing that

the proffered reason was mere pretext for discrimination. Defendant's motion for summary judgment on the claims of race and color discrimination under Title VII is granted.

B. Equal Protection

The Fourteenth Amendment prohibits a school from "deny[ing] ... any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Plaintiffs' equal protection claim is analyzed under the same framework as Plaintiffs' Title VI claim. *See Regents of Univ. of California v. Bakke*, 438 U.S. 265, 287 (1978). Because the Court has already determined that Plaintiffs have failed to show similarly situated non-Hispanic CRNA students were treated favorably, their equal protection claims also fail.

C. Procedural Due Process

Plaintiffs contend that the Typhon allegations against them should have gone before the Honor Council and instead were presented by a biased Dr. Dunavan to Dr. Whited. Plaintiffs argue that Dr. Dunavan's "prosecutorial zeal' was intended to deprive them of their right to have their case heard by the Honor Council as provided in the College of Nursing Handbook. Plaintiffs claim this was a violation of their procedural due process rights.

The Board argues that Plaintiffs' dismissal was academic in nature, not disciplinary. The Eighth Circuit requires that "a student who is dismissed for academic reasons from a public university must be afforded notice of faculty dissatisfaction and potential dismissal, and the dismissal decision must be careful and deliberate." *Doe v. Univ. of Nebraska*, 451 F. Supp. 3d 1062, 1114 (D. Neb. 2020) (quoting *Richmond v. Fowlkes*, 228 F.3d 854, 857 (8th Cir. 2000)). The Court finds that Defendant's reasons for dismissal of Plaintiffs included both a disciplinary and an academic reason. However, the academic reason, i.e., failure to achieve a C or better in all course work, resulted from the disciplinary reason.

The Eighth Circuit has stated that, in a disciplinary case, "procedural due process must be afforded a student on the college campus 'by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures.'" *Doe*, 451 F. Supp. 3d at 1114 (quoting *Jones v. Snead*, 431 F.2d 1115, 1117 (8th Cir. 1970); *Esteban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1089-90 (8th Cir. 1969) (reciting due process afforded a college student and adding "that school regulations are not to be measured by the standards which prevail for the criminal law and for criminal procedure; and that the courts should interfere only where there is a clear case of constitutional infringement.").

Dr. Whited, Dr. Gonzalez, and Dr. Dunavan met separately with each Plaintiff and presented them with their Disciplinary Action Reports and supporting documents. Plaintiffs admitted that they had entered information in Typhon for days when they did not work. Dr. Whited provided Plaintiffs with dismissal letters at the end of their meeting. "Due process does not require a delay between the notice and the opportunity to respond." *Keefe v. Adams*, 840 F.3d 523, 535 (8th Cir. 2016) (quoting Sutton v. Bailey, 702 F.3d 444, 448 (8th Cir. 2012) (quotation omitted).

One week later, Plaintiffs separately appealed their dismissals to Dr. Cowan. In their appeal, they alleged that other Program students falsified Typhon entries and alleged that the decision to dismiss Plaintiffs was discriminatory. Dr. Cowan reviewed each Plaintiff's academic file, the Disciplinary Action reports, the appeals, and other documentation provided. She met in-person with each Plaintiff. Plaintiffs were allowed to bring evidence supporting their appeal allegations. Dr. Cowan found the evidence against the Plaintiffs to be overwhelming and she upheld their dismissals.

Assuming the existence of a liberty or property interest, the Court finds that Plaintiffs were awarded at least as much due process as the Fourteenth Amendment requires. Plaintiffs were given notice and an opportunity to be heard by Dr. Whited, Dr. Gonzalez, and Dr. Dunavan before dismissal. They appealed their dismissals. Plaintiffs met with Dr. Cowan and were allowed to present any evidence supporting their appeals. Further, Plaintiffs were not entitled to a review by the Honor Council. According to the College of Nursing Handbook and the Nurse Anesthesia Program Handbook, cases involving clear evidence or conclusive proof of a violation will be handled directly by administration without Honor Council consideration. (Dkt. No. 50-37 at p. 26; Dkt. No. 50-2 at p. 43). Plaintiffs admitted that they made intentional false entries in Typhon. Therefore, there was clear evidence of  a violation. Plaintiffs' procedural due process claims fail.

E. Substantive Due Process

Assuming that a cause of action exists for violation of substantive due process rights of a university student subject to dismissal, "the student would still have to demonstrate arbitrary and capricious conduct on the part of university officials by showing that there was no rational basis for the university's decision or that dismissal was motivated by bad faith or ill will unrelated to academic performance." *Schuler v. Univ. of Minnesota*, 788 F.2d 510, 515 (8th Cir. 1986) (citing *Bd. Of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 948, 91–92 (1978); *Hines v. Rinker*, 667 F.2d 699, 703 (8th Cir. 1981). "Truly irrational conduct is conscience shocking, in a constitutional sense." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (quoting *Skokos v. Rhoades*, 440 F.3d 957, 962 (8th Cir. 2006) (internal quotations omitted)).

Plaintiffs have failed to prove irrational conduct by those involved in their dismissal. Plaintiffs were on academic probation when Dr. Dunavan received word from Ms. Moreno that

Plaintiffs had missed a significant number of clinical days at ACH. Dr. Dunavan investigated Plaintiffs' Typhon records and found falsified entries. Plaintiffs did not deny the allegations. Dismissal under these circumstances is not arbitrary or capricious and Plaintiffs have presented no evidence that Dr. Dunavan, Dr. Gonzalez, Dr. Whited, or Dr. Cowan were motivated by bad faith of any kind. The motion for summary judgment of Plaintiffs' claims for violation of their substantive due process rights is granted.

III. Conclusion

For these reasons, Defendant's motion for summary judgment (Dkt. No. 36) is GRANTED. The jury trial scheduled for November 16, 2026 is cancelled. The Clerk is directed to close the case.

IT IS SO ORDERED this 28th day of October, 2026.

James M. Moody Jr.
United States District Judge